UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EARIN LAND ) | |
| ) | |
| Plaintiff, ) | Case No. 06 C 4512 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| PAUL J. KAUPAS, JOHN MOSS, ) | |
| STEVEN MCGRATH, PATRICK MAHER, ) | |
| MARTIN NOWAK, DUANE DAVIS and ) | |
| MICHAEL HOMBERG, ) | |
| ) | |
| Defendants. ) | |

## **MEMORANDUM OPINION & ORDER**

Defendants Paul J. Kaupas, John Moss, Steven McGrath, Patrick Maher, Martin Nowak, Duane Davis and Michael Homberg (collectively "the Defendants") move for summary judgment on Earin Land's Complaint (the "Complaint"), which seeks to hold the Defendants liable under 42 U.S.C. § 1983 for political retaliation in violation of the First Amendment to the U.S. Constitution. Defendants' motion is granted.

### I. LEGAL STANDARD

Summary judgment is warranted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008).

## II. BACKGROUND[1]

Land has worked for the Will County Sheriff's Office (the "Sheriff's Office") since 1989 and was promoted to the rank of sergeant in 2002 after Paul Kaupas was elected Sheriff of Will County, a position he still holds. Land actively supported Kaupas's run for Will County Sheriff in 2002 by, *inter alia*, attending campaign strategy meetings, parades, and fundraisers, distributing political signage, and selling fundraising tickets. On March 7, 2005 Land met with defendant Martin Nowak, the Undersheriff for Will County and Kaupas's campaign manager in 2002, and told him that he was leaving Sheriff Kaupas's campaign. In the course of the conversation Land also complained to Nowak about not being allowed to use a specific police vehicle, not getting a call from Kaupas after he had surgery (Kaupas's wife did call), and being transferred out of the canine unit despite "volunteering" for the transfer. Land alleges that he endured six separate incidents of retaliation as a result of this conversation with Nowak.

On May 2, 2005 Land placed his hand over the ear of a subordinate named Dan Patriquin and kissed his own hand as well as part of Patriquin's ear. Patriquin was upset by the incident and let many others on the force know as much. A month after the incident, Patriquin filed a formal sexual harassment complaint against Land. Defendant Duane Davis, Patriquin's "liaison officer" at the time, encouraged him to file the complaint after Patriquin made it known to Davis that he never wished to work with Land again. The complaint led to a formal investigation against Land conducted by defendant

---

[1] The facts in this opinion and order are derived from the parties' statements of facts filed pursuant to Local Rule 56.1. Unless indicated, the facts are undisputed. At the summary judgment stage, the court is only to consider facts that are supported by evidence that would be admissible at trial. *Scott v. Edinburg*, 346 F.3d 752, 759–60 & n.7 (7th Cir. 2003). To the extent that facts are considered herein they are deemed to be admissible unless indicated to the contrary in the Analysis section.

Steven McGrath, a sergeant in the Internal Affairs Unit of the Sheriff's Office. Land received a one-day suspension as a result of the investigation for "conduct unbecoming" but was not found to have violated the internal sexual harassment policy of the Sheriff's Office.

A second investigation ensued after statements obtained from various witnesses to the ear-kissing incident contradicted some of Land's statements during the first investigation. This time Land was charged with untruthfulness, failure to cooperate with an investigation and conduct unbecoming. Land admitted that some of his answers during the first investigation were less than forthright. Kaupas dropped the investigation and chose not to punish Land.

Land also alleges four other instances of retaliation. The facts relevant to those other incidents are set out in the analysis section below.

### III. ANALYSIS

To make out a prima facie case of First Amendment retaliation Land must show that (1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter free speech, and (3) his speech was at least a motivating factor the Defendants' actions. *See Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). Adverse employment actions or a series of petty harassments committed in retaliation for a person's political beliefs or affiliations are likely to deter free speech and therefore violate the First Amendment. *See Pieczynski v. Duffy*, 875 F.2d 1331, 1336 (7th Cir. 1989).

Defendants contend in their reply brief that Land has failed to establish that his speech was protected by the First Amendment because the discussion Land had with

3

Marty Nowak (Kaupas's campaign manager) on March 7, 2005 was an attempt to "leverage [Land's] political support for personal gain." *See* Reply 2-3. This gloss on Land's conversation is not supported by the record when viewed in the light most favorable to Land. At this stage, a proper reading establishes that Land told Kaupas's campaign manager that he was leaving Kaupas's campaign. Notwithstanding the precise content of his conversation with Nowak, withdrawing support from a political candidate is protected conduct under the First Amendment. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 (1990) (retaliation "based on political affiliation or support [is] an impermissible infringement on the First Amendment rights of public employees"). The record reflects that Land withdrew from Kaupas's campaign, an action entitled to the protection of the First Amendment.

The Defendants appear not to contest whether the deprivations Land endured were likely to chill free expression, leaving the court to consider the crux of the parties' dispute: whether Land's withdrawal from Kaupas's campaign motivated the adverse actions he suffered. *See Massey*, 457 F.3d at 716. As an initial matter, Land must establish that his withdrawal from Kaupas's campaign was a substantial or motivating factor which lead to the adverse actions against him. *See id*. (citing *Mt. Healthy City Sch. Dist. Bd. Of Educ.*, 429 U.S. 274, 287 (1977)). A motivating factor need not be the only factor or a but-for factor, and the evidence establishing it may be circumstantial. *Id*. Assuming Land makes this initial showing, Defendants must produce evidence that Land's protected conduct was not the but-for cause of the adverse actions. *Id*. Should Defendants meet this burden, Land would then be required to present evidence from

which a reasonable jury could infer that the Defendants' proffered reasons for the adverse actions were pretextual. *Id*.

In his response brief Land presents what he characterizes as "bits and pieces" of circumstantial evidence to establish that his protected conduct was the motivating factor behind six allegedly adverse actions against him: (1) the filing of a sexual harassment complaint; (2) an internal affairs investigation which resulted from the sexual harassment complaint; (3) the propagation of false allegations; (4) the decision to deny Land a position in the traffic department in favor of another candidate; (5) not selecting Land to attend "staff and command" training; and (6) selecting another candidate for service on an awards committee. *See* Resp. 8-13.

As a preliminary matter, Land asserts that all of the Defendants were aware of his withdrawal from Kaupas's campaign because it became common knowledge within the department. *See* Resp. 8. Though defendants Davis, McGrath, and Maher[2] disclaim knowledge of which candidate Land was "going to support" at the time of their various adverse actions against him, these statements are irrelevant because they do not disavow knowledge that Land withdrew from Kaupas's campaign – the protected conduct at issue in this action. Moreover, at this stage the court must credit Land's assertion that his protected conduct was common knowledge because Land provides sufficient evidence that news of his withdrawal was widely disseminated in the Sheriff's Office. Even so, knowledge of Land's withdrawal is by itself insufficient to establish a retaliatory motive. *See Sanchez v. Henderson*, 188 F.3d 740, 747 (7th Cir. 1999). To state a prima facie case of First Amendment retaliation Land must put forth evidence to show that his protected

---

[2] During the relevant period Patrick Maher was the Deputy Chief of the Patrol Bureau of the Sheriff's Office.

conduct was a motivating factor in the adverse actions against him. Land has failed to meet this initial or ultimate burden with respect to each of the six adverse actions he complains of. The court addresses the six incidents in turn.

    A.  Sexual Harassment Complaint

On May 2, 2005 Land put his hand over Dan Patriquin's ear and kissed his own hand as well as part of Patriquin's ear. Patriquin testified that he was "pissed off" about the incident because he is a "dude and dude[s] don't be kissing on dudes." Patriquin Dep. 81:15. News of the incident spread and multiple individuals of higher rank than Patriquin suggested that Patriquin file a sexual harassment complaint against Land. More than a month after the incident Patriquin filed a sexual harassment complaint against Land with the encouragement of defendant Duane Davis, his then "liaison officer," and with the assistance of Joanne Jostes, a coworker. Patriquin no longer wished to work with Land after the incident and Davis told him that he needed to file a complaint against Land if Patriquin did not want to work with Land again.

At the outset, the court notes that even were Land to establish his prima facie burden regarding the filing of the sexual harassment complaint or the ensuing investigations he cannot ultimately prevail because he admitted that he kissed Patriquin's ear and that he should not have done so. These admissions mean that Land cannot show that "a rational fact finder could infer that . . . [defendants'] explanations [for the adverse actions] were lies." S*ee Vukadinovich v. Bd. Sch. Trs. N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (after defendant proffers evidence of a non-retaliatory motive for an adverse actions it is plaintiff's burden at summary judgment to show that a defendants stated reasons for the adverse action are "lies"). In any case, Land has failed even to

meet his prima facie burden because he presents no evidence that Davis, the only defendant involved in this incident, acted with a retaliatory motive. *See Massey*, 457 F.3d at 718 (refusing to impute the retaliatory motive of the person targeted by protected speech to other individuals). Circumstantial evidence such as suspicious timing or disparate treatment of similarly situated individuals may suffice to meet Land's initial burden. *See Massey*, 457 F.3d at 716. Here, however, the three-month gap between the filing of the complaint against Land and his protected conduct is of limited probative value because by kissing Patriquin's ear Land himself precipitated the "timing" of the incident which led to the complaint he alleges was retaliatory and the Seventh Circuit has found delays of as little as a month insufficient to support an inference of retaliatory motive. *See Jasmantas v. Subaru-Isuzu Auto., Inc.*, 139 F.3d 1155, 1158 (7th Cir. 1998) (one month gap between protected conduct and discharge insufficient to establish retaliatory link absent other evidence). Moreover, no matter how proximate to the protected conduct, suspicious timing on its own is insufficient to support a reasonable inference of retaliation and Land has provided no other evidence to support such an inference. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). Land has not shown that Kaupas had a hand in the filing of the complaint, nor has Land explained why Davis would want to retaliate against him by encouraging Patriquin to file a complaint. Indeed it is unclear how Davis can be held liable for "retaliating" against Land when Patriquin – who is not a defendant in this action – is the person who signed and filed the sexual harassment complaint. Patriquin's testimony that he felt "hounded" by Davis to file the complaint is irrelevant given Patriquin's admitted desire never to

work with Land in the future, and his insistence that he wished to file the complaint against Land.

Land has also failed to present evidence of disparate treatment, which in this context requires that the employee serving as a comparative reference to the plaintiff dealt with the same supervisor, was subject to the same standards, and engaged in similar conduct, but was treated differently. *See Ezell v. Potter*, 400 F.3d 1041, 1049-50 (7th Cir. 2007). Neither of Land's exemplars of disparate treatment (Lieutenant A,[3] who Kaupas demoted for being a poor supervisor, and Steven Hunter,[4] who was orally reprimanded for failing to comply with a change of address notification policy) engaged in sexual harassment and both *were punished* for their conduct. Accordingly, Land has not met his prima facie burden because he has not presented any evidence that his protected conduct was a motivating factor in the filing of the sexual harassment complaint against him.

B. Internal Affairs Investigation.

Defendant McGrath conducted two internal affairs investigations of Land's conduct. The first occurred automatically after the filing of Patriquin's complaint under the terms of the sexual harassment policy governing the Sheriff's Office and the second was sparked by a conflict between Land's representation of the kissing incident and the statements of various witnesses to the incident. During the administrative interview that was part of the second investigation Land agreed that some of the answers he gave in the course of the first investigation were inaccurate. After the second investigation, Kaupas accepted McGrath's recommendation that the charge against Land for untruthfulness be

---

[3] Lieutenant A's identity is disclosed in documents filed under seal.
[4] Steven Hunter is a "canine officer" in the Sheriff's Office.

8

dropped. Land received a one-day suspension for conduct unbecoming as a result of the first investigation.

Land contends that a statement by McGrath to Patriquin that McGrath "was sick and tired of hearing it's Earin Land being Earin Land, and they're going to get him on this one" along with testimony that McGrath made light of the kissing incident and the ensuing investigation to Pamela Lessner, a deputy in the Sheriff's Office, and told her that "we tried really hard to get [Land] in front of the merit commission"[5] shows that Land's protected conduct was a motivating factor in the investigations against him. Again, even if such statements were sufficient to meet Land's prima facie burden to show that his protected conduct was a motivating factor which led to the investigations against him, Land cannot ultimately prevail because he admitted to the wrongfulness of the kissing incident and to the prevarications during the first investigation which led to the second investigation. In other words, Land has admitted that Defendants' proffered explanation for the adverse actions against him is true. Accordingly, Land cannot and has not put forth evidence sufficient for a reasonable jury to find that Defendants' stated reason for the investigation was a lie. S*ee Vukadinovich*, 278 F.3d at 699.

The evidence Land puts forward in support of his prima facie burden is evidence of animus on McGrath's part, but the animus is not obviously related to Land's withdrawal from Kaupas's campaign and Land does not provide additional evidence that makes this necessary causal connection. *See Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003) (direct evidence of retaliation "essentially requires an admission by the

---

[5] Though the composition and function of the Merit Commission is left unclear in the parties' papers, it is apparently a discretionary body that has the power to dismiss an officer. Sheriff Kaupas has the authority to send an officer in front of the Merit Commission. He did not exercise that authority in Land's case.

decision maker that his actions were *based on the prohibited animus*.") (emphasis added and internal quotation marks omitted). McGrath's statement that he was "sick of hearing it was Earin Land being Earin Land" indicates anger related to Land's prior jocular behavior (discussed *infra*) or the tolerance of that behavior by others in the Sheriff's Office; it is not evidence that his anger relates to Land's protected conduct. While Lessner's testimony that McGrath said that "we tried really hard to get [Land] in front of the merit commission" may additionally indicate some level of joint animus between McGrath and others in the Sheriff's office, it is also not evidence that Land's protected conduct motivated McGrath's investigation because, again, it does not indicate why McGrath and the implied others were motivated to "get" Land. Moreover, the "we" McGrath was referring to cannot be construed to include Sheriff Kaupas as he need not "try hard" to put Land before the Merit Commission: Kaupas has the official authority to do so of his own accord. *See* Land Dep. 184:1-4. Thus Kaupas, the person with the most obvious retaliatory motive (Land withdrew from his campaign, after all), declined to put Land in front of the merit commission; the statements Land cites do not link McGrath's animus to Land's protected conduct; and, finally, Land provides no evidence to support imputing Kaupas's presumed motive to McGrath. *See Massey*, 457 F.3d at 718. Accordingly, Land has failed to meet the initial and ultimate evidentiary obligations required to defeat summary judgment here.

    C. False Statements

Land argues in his response brief that "Davis and McGrath were instrumental in pushing false allegations against" him that led to the filing of the sexual harassment complaint and the ensuing internal investigations. Land has admitted that the allegations

10

in the complaint filed against him were true. Land's allegations regarding the "false" statements therefore lack any evidentiary basis and are rejected.

D. Failure to Award Traffic Position

Land cites no evidence at all to support his contention that he was denied a lateral position in the traffic department based on his protected conduct. In fact Raymond Horwath, the Commander of the Traffic Section who selected another officer for the open position over Land, is not a party to this suit and stated in an uncontested declaration that he did not discuss his selection for the position with any of the Defendants, but rather informed Maher, Moss[6] and Kaupas of his choice.[7] Without presenting some evidence to contradict Horwath's statement that none of the defendants were involved in the adverse action, Land cannot prevail. *See Massey*, 457 F.3d at 718 (rejecting imputation of retaliatory animus on non-decisionmaker where decisionmaker testifed that the decision to take the adverse action was his alone and that testimony was unrebutted). Moreover, Horwath provided a reasonable, legal, and unrebutted rationale for selecting another officer for the position over Land and Land has not provided evidence sufficient upon which a jury could find that Horwath's rationale was a lie. *Id*. at 717. While Horwath commended Land's knowledge of and experience with "accident reconstruction," Horwath noted that such expertise duplicated his own skills. The officer Horwath selected over Land had expertise in DUI enforcement, a skill set that complemented Horwath's own and for which the department had received grant money. Land did not

---

[6] During the relevant period John Moss was the chief Deputy of the Enforcement Division of the Sheriff's Office.

[7] Land claims that he disputes that Horwath made the decision to hire the other officer without consulting with any of the defendants, but the record evidence he cites in support does not, in fact, contradict Horwath's testimony. *See* Resp. to L.R. 56.1 Stmt. ¶¶ 64-66. The court, accordingly, deems these facts admitted.

11

have comparable experience in the DUI enforcement arena. Moreover, the timing of the denial was not suspicious, as it occurred nearly eight months after his protected conduct. *See Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 398-99 (7th Cir. 1999) (four-month time gap too long to constitute evidence of link between protected conduct and adverse action); *E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 953 (7th Cir. 2001) (six-week delay between protected conduct and retaliation insufficient to meet prima facie burden). Land's contention that his denial of a lateral position in the traffic department was retaliatory is therefore rejected.

E. Training Classes and Awards Committee Service

Though Defendants do not contest Land's assertion that the denial of his requests to attend a training class and serve on an awards committee constitute adverse actions sufficient to trigger a constitutional remedy, the Seventh Circuit has noted that viewing any employer action that is colorably negative as adverse "no matter how unlikely to deter a person of ordinary firmness from" exercising his rights would "trivialize" the First Amendment. *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). The court finds that the denial of Land's request to serve on an awards committee is not an adverse action because no rational jury could find that it would deter free speech. *See Massey*, 457 F.3d. at 720. But even assuming that the denial of service on the awards committee constitutes an adverse action, Land has presented no evidence to show that Maher's proffered reason for denying Land service on the committee was a lie. S*ee Vukadinovich*, 278 F.3d at 699. Maher stated that he made the decision not to permit Land to serve on the committee because he would have incurred overtime pay for the work during a period where the Sheriff's Office was looking for cost-savings where it could. Land has not come forth

with any evidence showing that Maher's proffered reason for the denial was a pretext and thus has failed to meet his evidentiary burden.

As for the denial of Land's request to attend staff and command training, the court concludes that a reasonable jury could possibly find that such a denial meets the low adverse action threshold applicable in the First Amendment context. *See Bart*, 677 F.2d 622, 625 (finding a concerted prolonged campaign of harassments that had about it a "certain air of the ridiculous" cognizable as First Amendment retaliation). Land cannot prevail, however, because he has not put forth evidence sufficient to establish that the reason for not granting his training request was a lie. As a preliminary matter, Land does not dispute that sending an officer to the staff and command class costs the department thousands of dollars and is accordingly a privilege that the Sheriff's Office grants judiciously. In some years the department has not sent a single officer to attend the training for budgetary reasons. McGrath, for instance, requested permission to attend staff and command training annually beginning in 1999 and was granted permission only in 2008, despite having more seniority than Land and supporting Kaupas politically in the 2002 and 2006 elections.

Kaupas, Maher, and Nowak maintain that the decision to deny Land's request to attend staff and command training turned on the negative message that allowing Land to attend would send to other employees in the Sheriff's Office because he was "under discipline" for conduct unbecoming. Land offers no evidence sufficient to meet his burden to show that this proffered reason for the denial of his training request was a lie. S*ee Vukadinovich*, 278 F.3d at 699. As circumstantial proof, Land points to Lieutenant A, who was a campaign contributor to Kaupas and was permitted to attend the FBI

13

Academy after Kaupas demoted him for showing poor supervisory judgment. Defendants contend that Lieutenant A's case is distinguishable because the internal affairs investigation of Lieutenant A concluded that the allegations of excessive force lodged anonymously against him were unfounded and so Lieutenant A was not placed "under discipline" as Land was. Accordingly, Defendants maintain that allowing Lieutenant A to attend the FBI Academy did not implicate the same policy concern cited in the denial of Land's request. Land has provided no evidence that the policy concern cited by Kaupas, Maher, and Nowak was a pretext for retaliation such that a reasonable jury could find in his favor.[8] Whether or not Lieutenant A was treated differently than Land is ultimately irrelevant. A rational fact-finder could not rely on that evidence alone to infer that Kaupas, Maher and Nowak's explanation for not allowing Land to attend staff and command training was a lie and Land has put forth no other evidence to rebut this proffered rationale. *See Vukadinovich*, 278 F.3d at 699.

F. General Circumstantial Evidence of Retaliatory Motive

Land cites four other "bits" of evidence that are not directly related to the six adverse incidents he complains of: (1) that Land was promoted to sergeant the day after Kaupas's election; (2) that Land was not penalized in 2003 (while still a member of the campaign) for engaging in immature and disruptive behavior, antagonizing a subordinate, and harassing officials in the Village of Homer Glen; (3) that Steven Hunter was subjected to an oral reprimand for an infraction Hunter admitted to committing because he supported Kaupas's opponent in the election; and (4) that Lieutenant A received preferential treatment based on his political support of Kaupas even though Kaupas

---

[8] Arguably, the comparison between Land's treatment and Lieutenant A's could constitute circumstantial evidence sufficient to meet Land's prima facie burden.

demoted him.  Land apparently presents this evidence to provide general circumstantial support for his prima facie case, but on what legal basis the court may apply such general evidence to specific adverse incidents remains a mystery.  The court assumes that Land is raising a "pattern or practice" argument that would allow the court to impute retaliatory intent from the Defendants' conduct, but is unaware of any case or statute that would allow it to do so in the First Amendment context.  *See contra Massey*, 457 F.3d at 718 (refusing to impute a defendant's retaliatory motive to a non-party and also refusing to impute motive based on an implied and general "retaliatory attitude" among the relevant officials).  In any event, the legal authority is irrelevant in the final analysis because none of these contentions when considered alone is evidence of retaliatory intent of any sort, and when considered together, these facts do not add up to more than the *de minimis* sum of their parts.

Land's promotion to sergeant the day after Kaupas's election might constitute evidence that Kaupas favors political supporters, or it might not, but in either case it is not evidence that Kaupas retaliated against Land for leaving his campaign via the six adverse actions discussed above, and it is insufficient to establish that there was a pattern or practice of such favoritism when considered on its own or in reference to all the other facts in this case.  As for the incidents in 2003 that Land alleges Kaupas turned a blind eye to, the record is silent as to whether such behavior could have been treated as a formal infraction of office policy, and Land is not contending that any of his behavior in 2003 could have lead to the filing of a complaint or the instigation of an investigation against him (the kind of treatment he alleges was retaliatory).  Without such information these facts cannot serve as a baseline from which Land might assert that Defendants'

treatment of him materially changed after he engaged in protected conduct.  Moreover, Defendants point out that Land was not satisfied with his treatment on the force *prior to leaving the campaign*.  Indeed, in the same conversation that constitutes Land's protected conduct, Land also complained to Nowak, *inter alia*, that he felt "brushed off" by Kaupas, was dissatisfied with his vehicle assignment, and was upset about his removal from the canine unit.  This dissatisfaction while Land was a part of Kaupas's campaign undercuts whatever minor probative value his evidence of preferential treatment may provide.

Steven Hunter's receipt of an oral reprimand for  violating office policy cannot serve as evidence of a pattern or practice of political retaliation because Hunter admitted to violating the policy he was reprimanded for and conceded that the policy he violated had an important purpose.  That Hunter also testified that Kaupas told him he was "guilty by association for supporting [Kaupas's opponent]" (Resp. 7) is therefore of no moment because (in accordance with the burden shifting analysis discussed *supra*) the evidence discloses a non-retaliatory reason for the adverse action Hunter suffered and Land has put forth no evidence showing that the reason for giving Hunter an oral reprimand was a pretext.

Finally, Lieutenant A's experiences in the Sheriff's Office (discussed in sections A and E above) fare even worse as general evidence of Kaupas's preferential treatment of political supporters than they did as specific of evidence of such treatment in the training context discussed above.  After all, Kaupas *demoted* Lieutenant A, a much more severe adverse action than any of the six that Land complains of.

## IV. Conclusion

Defendants' motion for summary judgment is granted. The case is dismissed.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 30, 2009